## SOTHAM v. MACOMBER.

1. BROKERS—FEES—VENDOR AND PURCHASER—CONTRACTS.

Where plaintiff was engaged by defendants to sell a quantity of land at auction for $1,000 and his expenses, and for a stipulated part of all sales in excess of an agreed sum, the trial court correctly held that there could be no recovery for sales not actually made on terms satisfactory to the owners or on terms as offered before the sale.

2. SAME—EVIDENCE—RESPONSIBILITY OF BIDDER.

It was also proper to receive evidence that one of the bidders at the sale was not pecuniarily responsible and was unable to comply with the terms publicly offered and was never in a position to buy the land on which he made a bid.[1]

3. EVIDENCE—CONFIDENTIAL COMMUNICATIONS—PRIVILEGE.

Testimony of a stenographer, furnished at a sale of land by owner to broker, paid for out of the proceeds, as to matters learned as part of her employment, was admissible in an action by the broker for his commissions and was not subject to the rule of privileged communications.

---

[1] As to broker's right to compensation where purchaser procured by him is financially unable to perform his contract, see note in 20 L. R. A. (N. S.) 1168.

Error to Montcalm; Davis, J.  Submitted November 6, 1913.  (Docket No. 82.)  Decided April 7, 1914.

Assumpsit by Thomas F. B. Sotham against Esther Macomber, executrix, and Charles M. Miller, executor, of the estate of Allen Macomber, deceased, and others, for commissions and expenses as a broker.  Judgment for plaintiff for less than the claimed amount and he brings error.  Affirmed.

*Laurence W. Smith*, for appellant.

*N. O. Griswold* and *S. F. Kennedy*, for appellees.

MOORE, J.  This action is brought to recover commissions claimed to have been earned by the plaintiff on the sale of various parcels of land in and about Lakeview, Montcalm county, Mich.; some of the sales being consummated and others, it is claimed, being defeated by the actions of the vendors.  It is also sought to recover a percentage of the cost of conducting the sale.

The firm of Macomber & Bale owned many thousands of acres of wild and improved lands in and around Lakeview.  Mr. Macomber died, and his wife, Esther Macomber, as executrix, and Charles M. Miller, as executor, with the will annexed, assumed the administration of his estate.

It is claimed by plaintiff as follows:

"That plaintiff should undertake to sell all the lands defendants owned about Lakeview.

"He was to arrange for, advertise, and conduct the auction sale of these lands, and was to receive the sum of $1,000 and his expenses in any event.  A list price was placed on each lot, and in the event that the total sales amounted to more than the list plus the expenses of sale, including $1,000 for plaintiff, then and in that case such excess was to be equally divided between plaintiff and the defendants; the plaintiff receiving one-half.  All expenses were to be borne by the defendants. * * *

"It is claimed by the plaintiff that certain village property was put into the sale in the disposal of which he was to have no interest, except that these lots were to bear their *pro rata* of the general sale expense, which, in the event of a surplus, would inure one-half to his benefit."

This claim is not admitted by the defendants.

"The plaintiff claims also for the repairs necessarily made to his automobile, for parts and tires worn out in the sale service."

This claim is not admitted by defendants.

After the arrangement was made, an elaborate illustrated catalogue of 90 pages, containing maps, landscape views, pictures of State and other buildings, advertising for sale 111 tracts of land at auction, which was to be held September 6th, 7th, and 8th, and October 4th, 5th, and 6th, was published and freely circulated. This catalogue advertised special low-rate, round-trip excursion rates. The announcement was signed as follows:

"Lakeview, Michigan, July 15th, 1911.
"Estate of Allen Macomber, Deceased.
"Esther Macomber, Administratrix.
"Charles M. Miller, Administrator.
"Macomber & Bale.
"John J. Bale.
"Sotham & Sons Land Co.
"Carey M. Jones, Auctioneer.
"T. F. B. Sotham, Sale Manager."

At the close of the catalogue were printed 12 rules and regulations in relation to the sale. The following of which are important in this litigation:

"Rule IV.—Deposit. Whenever the auctioneer shall declare any lot (subdivision of lot, or combination of lots) sold, the buyer or buyers thereof shall forthwith deposit at least ten per cent. of the purchase price with the clerk of the sale as a first payment. Such deposits may be made in currency, bank draft, certificate of deposit or certified check, endorsed to the

satisfaction of the clerk. In event any buyer should fail or neglect to satisfactorily settle such first payment, the auctioneer may declare sale void and thereafter resell the premises in question."

"Rule IX.—Terms: *Cash or its equivalent.* Half cash with mortgage on land purchased to secure payment of balance will be deemed the same as all cash. Earnest, capable, honest workers desiring to buy on smaller cash payments will be accommodated, but before bidding should arrange for credit with the sale manager. Such sales will be covered by contract. Interest on all deferred payments will be at the rate of six per cent. per annum. Time to suit purchaser within 5-year limit unless otherwise agreed.

"Rule X.—Settlements. The right is reserved to the vendors to declare off any sale or sales not satisfactorily settled for within ten days from date of such sale and to declare any payment or payments under Rule IV forfeited thereafter.

"Rule XI.—Commissions. One commission, of one dollar ($1.00) per acre, on each lot or subdivision of lot sold and satisfactorily settled for, will be paid land agents who comply with the following conditions. Said land agent must attend sale in person. * * * Such names must be filed at least twenty-four hours prior to clients' purchase at sale; otherwise the agent will forfeit any commission rights that could accrue hereunder.

"XII. Any and all statements, offers, bids, sales, payments or settlements made by buyer, seller or agents of either, at these auctions are subject to these rules. The right to interpret these rules is strictly reserved to and in the vendors."

Part of the lands were sold and part were not. The parties to this litigation could not agree as to the compensation due the plaintiff, and this suit was commenced by summons, followed later by a declaration on all the common counts in assumpsit. This was followed by a bill of particulars for "commission due as per contracts earned on the following pieces of real estate." Then followed the lot numbers and the expense account. The case was put at issue, and early in the trial the respective counsel made concessions

that simplified the issues. It was conceded by defendants that the profits on the land sold were $5,485, less the expenses incurred, which, including $1,000 for plaintiff's salary, amounted to $5,062.32, and that if the lands sold on contract were to be counted as though sold for cash, there was due plaintiff $234.13. This made no allowance for automobile repairs, salaries to the sons of plaintiff for acting as chauffeurs, or for the making of a map; it being the claim of defendants that plaintiff was not entitled to any allowances on these claims, except for the map, and as to that the parties could not agree as to the amount.

The trial judge submitted these two claims to the jury, who returned a verdict of $25 for the map, and $300 for chauffeurs' salaries and automobile repairs, and a verdict and judgment were entered in favor of the plaintiff for $500.25. The defendants have not appealed. The plaintiff has brought the case here by writ of error.

The first question we will consider is whether the jury should have been allowed to assess some damages because certain village properties should have borne their *pro rata* share of the general sale expense. It was the claim of defendants that these lands were put in the catalogue, at the request of plaintiff, for advertising purposes only, and that plaintiff's claim that they should bear part of the expense was untenable. The court was of the opinion that in any event there was no showing which would warrant an intelligent apportionment *pro rata* of these expenses. Counsel does not suggest in his brief whether it should be upon the basis of values, or acreage, or number of lots. We agree with the judge that there is no basis for intelligently arriving at an amount for this purpose.

The special grievance of the plaintiff is that the court decided, as a matter of law, that he was not

entitled to compensation as to various lots of land, where no sale was, in fact, made. It will not be necessary to discuss in this opinion each lot which was offered for sale, and struck off to a bidder, as is done by counsel in their brief. We will take up the most important items, and the ones most favorable to the claim of plaintiff. Those are lot 6 and lot 7.

We now quote from the brief:

"Lot 6 was struck off to Hiley Warner at $22,000 and sold to him. Lot 7 was struck off to the same buyer at $1,800, making a total of $23,800. Before the bidding started, Bale and plaintiff urged Warner to bid. Warner told them he couldn't comply with the rule as to 10 per cent. down, and defendant Bale told him to bid, and he would take care of him, give him time on the 10 per cent. and on the balance. Warner told him he thought he could interest other parties in it. It was struck off to him in the presence of defendants Bale and Miller.

"Bale told Warner that whatever arrangement he made with Sotham as to time was all right with him. Sotham told him he could have 20 days on the 10 per cent., and 90 days or longer on the balance, to be half cash and half mortgage or all cash. Accordingly Warner gave a check due in 20 days, which satisfied Sotham and Bale, but not defendant Miller, and one due in 10 days was substituted.

"Warner interested Meade, Sandell, Lambertson, and Chappell in the deal, and they agreed to finance him and give him one-fifth of the profits. Warner told Bale he had interested Lambertson and Chappell, and that they would back him. Then Sotham sent Exhibit 19 to Warner and to the bank at which the check was payable, attempting to change the terms and get the balance above the 10 per cent. in cash on the same day the check was due.

"Sotham and the vendors went to Belding the day the check was due, and met Warner and his people. The Belding people objected to the change in terms, and offered to pay the 10 per cent. check of $2,380 that day, and to bind themselves to pay the rest within 30 days, reserving the right to give a mortgage of $12,000. This was agreed to by all parties. Then

the dispute arose over the form by which this agreement should be set forth.  Defendant Miller wanted a bond to guarantee payment of Warner's bid, and would not sign a land contract setting forth the agreement that was reached, on the advice of his attorney. The check was not protested until after the Belding meeting.  At that time they were ready to pay it. The financial ability of the Belding parties up to the $12,000 to be covered by mortgage was conceded on the trial.

"After this deal fell through, Sotham readvertised lots 1 to 7 for the October auction in his circular of September 23d, but they were not offered in that auction.  *   *   *

"The first assignment of error relates to the court's allowing the witness Warner to answer the following question: '*Q*. What property did you have in September, 1911?' (the time of the sale).  Unless the test of our performance is the buyer's ability at the time of the sale to pay the purchase price, the question was immaterial, and the answer should not have been received.  Under the agreement as to the conduct of the sale, the vendors—that is, the defendants —were to pass on all credits.  This would necessarily negative the idea of any guaranty on the part of the plaintiff of the financial ability of any purchaser. Nowhere in the correspondence is any such idea hinted at.  In this connection let it be noted from a reading of Exhibit 6, which forms the basis of the agreement, that plaintiff was bound only as a sale manager, and is not held as strictly as a broker would be.  His duty consisted in working out a plan and putting it through.  He was to run the sale and advertise it.  He lacked many characteristics of a broker. But, even if he is considered as a broker, without an agreement on his part to guarantee the financial ability of a buyer, such ability or inability is immaterial in an action for commissions.

"Before citing authorities on this proposition, I desire to call the court's attention to another matter directly connected with it, viz., that, where a purchaser is presented who is ready and willing to sign a contract in compliance with his offer, the failure of the vendor to require such a contract is no defense to an action for commissions if the sale falls through,

and to argue from that the proposition demonstrated by the cases that where buyer and seller enter into a contract of sale, the agent's commissions are not thereafter defeated by the financial inability of the purchaser to perform. Consequently it is our claim in this case, under this assignment, that Warner is to be treated as having entered into a binding contract to buy, and his financial ability to carry that out being immaterial, the question and answer excepted to should not have been received."

The defendants do not admit the truth of the statements of counsel as we have stated them, but it may be safely assumed counsel will make as favorable a claim for his client as the record will warrant.

The foregoing claim raises the pivotal questions in the case. Mr. Warner testified as to the extent of his property. When he gave the check referred to, he had not to exceed $100 in the bank. He had some horses and other personal property, all of which was chattel mortgaged. Exhibit 19 referred to in the brief of counsel for appellant, which we have quoted, reads:

"LAKEVIEW, MICH., Sept. 7, 1911.

"Hiley Warner, Orleans, Mich., to Macomber & Bale, Dr. to lots 1, 2, 3, 4, 5, 6, and 7 of land catalogue, $23,800.00. Due this day according to Rule 4 of the sale rules and regulations, a deposit of ten per cent., or $2,380.00, for which, purely as an accommodation to Mr. Warner, he was allowed to deposit a ten-day check, due on or before September 18, 1911. The balance of purchase price, $21,420.00, to be paid in cash on or before September 21, 1911, at the Farmers' & Merchants' State Bank of Lakeview, Michigan.

"N. B. Should the ten-day check for $2,380 not be paid on presentation September 18, 1911, the sale will be declared off, and bill rendered for such damages as may have been done. Should the check for $2,380 be paid on September 18, 1911, as agreed the said $2,380 will be held as a deposit under Rule 4, and forfeited as liquidated damages in event the balance of $21,420 is not paid in cash or its equivalent on the date and in the manner hereinbefore provided."

This exhibit was prepared and sent by the plaintiff, indicating his understanding of the situation. Notwithstanding the impecunious condition of Mr. Warner, the defendants were willing that he should have the benefit of his bid, if he could get the Belding parties to do what it was his duty to do, if the bid was to remain good, and the defendants and Mr. Sotham went to Belding to see what could be done.

The plaintiff claims an agreement was made by all the parties at Belding, and cites the testimony of the attorney, Mr. Hubbell. This witness, after testifying to the conferences held by the parties, and to drawing a contract which was satisfactory to his clients, and to the production by Mr. Miller of papers drawn by the attorney for defendant, closed his testimony as follows:

"*Q.* They four didn't get together and agree it was what they wanted and that they would sign it, did they? *A.* Oh, no; the two sides didn't get together upon it."

The conference ended without the parties being able to get together, and later the $2,380 check given by Mr. Warner went to protest.

Following the Belding conference Mr. Sotham prepared and circulated in large quantities a circular letter reading in part as follows:

"Lakeview, Michigan.
"CLOSING SESSION.                    GRAND WIND-UP.
"Wednesday, Thursday and Friday, October 4th, 5th, and 6th, 1911.   T. F. B. Sotham,
Sale Manager.
"LAKEVIEW, MICH., Sept. 23d, 1911.
*"Dear Sir:*
"Since last writing we 'woke up' and got busy adding attractive land bargains to those (lots 56 to 111 of catalog) originally set apart for the closing session Oct. 4, 5, and 6 of our Lakeview land auctions.
*      *      *

"Having revived somewhat from the disappointing

shock of low prices at the September auction, and adjusted ourselves to the situation, we saw that at the sale prices the lands we had sold were yet the very cheapest really first-class lands in Michigan. * * * Again, certain other buyers were disappointed in their money arrangements, and while the vendors will aid our customers in every consistent way and will not crawfish on any sale, no matter how absurdly low the price, it is obvious that they cannot be cut off from the right to reoffer in our October auction any September lot not settled for.

"Therefore, kindly take notice that in addition to lots 17 and 21 (passed) we will be able to reoffer lots 6, 7, 22, 36, 37 and 38 in our October auction. You will see by the catalog that lot 6 is the celebrated Macomber & Bale home farm made up of lots 1, 2, 3, 4, and 5. * * * Now, if you missed coming to the September sale remember that we have these lots where you can get another chance at them. * * *
　　　　[Signed]　"SOTHAM & SONS LAND CO.,
　　　　　　　　　"By T. F. B. SOTHAM."

The auction sale in October was held, but these lands found no purchaser, and had not been sold at the time of the trial. It is not very important in what way Mr. Sotham is characterized in this transaction, whether he is called sales manager, with a salary and expenses, with the right to one-half the net profits, or whether he is called a real estate broker; in either event he must show either a sale or the production of some one able and willing to purchase according to the terms fixed in the contract between him and the vendors, or to take the property upon terms agreeable to himself and the vendors.

As bearing upon the last of these two propositions, it was entirely proper to inquire into the pecuniary responsibility of Mr. Warner, who was the bidder, and to whom the property was struck off. The record shows beyond any question that Mr. Warner was never in a position to buy the lands; that Belding parties were never present at the sale; and that

though a conference was had with them at Belding, they and the vendors were not able to get together; and that nothing came of the extensive and expensive advertising, so far as securing a sale of these lands is concerned. The result of the ruling of the trial judge is that the plaintiff has been given a judgment for the balance due upon his share of the profits of all sales made, whether payment was made in cash, or partly in cash and partly upon land contract.

One other assignment requires attention. We again quote from the brief:

"13. This relates to permitting Miss Conant, the stenographer furnished the plaintiff, to testify in relation to Exhibit 43, the list she took from plaintiff's book of the list prices, the plaintiff claiming the communication is privileged. As appears on pages 8 and 9 of the record, in plaintiff's bill of particulars, Miss Conant's salary was a sale expense to which plaintiff contributed from the surplus. She was therefore as much his stenographer as the defendants'. * * *

"We submit that this communication, or, rather, this taking of information by a stenographer from records to which she is in confidence given access, demands the utmost protection. Its primary quality is confidence in nondisclosure. There can be no doubt that the universal opinion favors its maintenance. Compared with the benefit to a litigated case, if the privilege is abused the relation must terminate. The admission of the testimony was error. Its only purpose could be to dispute plaintiff when he says that his report of the list price of lot 94 contained in Exhibit 34 was an error on his part, unintentional and typographical, and that no such list was ever given him."

We have difficulty in understanding this contention. Mr. Sotham was the sales manager of defendants. Miss Conant was employed as stenographer to assist him in his duties, and was paid out of the expense fund, which, of course, came out of the proceeds of the sale of defendants' land. She owed no duty to Mr. Sotham that she did not owe to defendants, and

it was not the duty of either of them to withhold any information from defendants as to what was being done to promote the sales. We discover no reversible error in the case.

Judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.